**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

L.A., a legally incapacitated Minor, by and
through his Mother and Next Friend,
KIERSTEN REESER, KIERSTEN
REESER, Individually, JEREMY
ARMSTRONG, Individually

Plaintiffs,

Case No.:  21-12050
Hon: _____

vs.

**COMPLAINT AND**
**JURY DEMAND**

UNITED STATES OF AMERICA, and
W.A. FOOTE MEMORIAL HOSPITAL
a/k/a HENRY FORD ALLEGIANCE
HEALTH, and CHARLES EDWARD
ROLLISON, D.O., and RONALD
NICHOLS, M.D., and ALMA GARLO,
M.D.

Defendants.

---

JACK BEAM (P24600)
MATTHEW M. PATTERSON (P79553)
RYAN P. TIMONEY (P81685)
BEAM LEGAL TEAM, LLC
Attorneys for the Plaintiff
954 W. Washington Blvd., Ste. 215
Chicago, IL 60607
(312) 733-0930; (312) 733-0921 (fax)

GEOFFREY N. FIEGER (P30441)
FIEGER & FIEGER, P.C.
Attorney for the Plaintiff
19390 West Ten Mile Rd.
Southfield, MI 48075
(248) 355-5555; (248) 355-5148 (fax)

---

**A CIVIL ACTION BETWEEN THESE PARTIES ARISING OUT OF THE SAME**
**TRANSACTION OR OCCURRENCE HAS BEEN PREVIOUSLY FILED IN THIS**
**COURT WHERE IT WAS GIVEN CASE NO. 3:21-CV-11317, WAS ASSIGNED TO**
**JUDGE ROBERT H. CLELAND, AND IS STILL PENDING.**

_____
JACK BEAM (P24600)
MATTHEW M. PATTERSON (P79553)
RYAN P. TIMONEY (P81685)
ATTORNEYS FOR PLAINTIFF

1

<u>**COMPLAINT AND JURY DEMAND**</u>

NOW COME the Plaintiffs, L.A., a legally incapacitated Minor, by and through his Mother and Next Friend, KIERSTEN REESER, and KIERSTEN REESER, Individually, and JEREMY ARMSTRONG, Individually, by and through their attorneys, BEAM LEGAL TEAM, L.L.C. and FIEGER & FIEGER, P.C., and for her cause of action against the Defendants herein, states unto this Honorable Court as follows:

<u>**GENERAL ALLEGATIONS**</u>

1.      Jurisdiction is proper pursuant to the Federal Tort Claims Act, 28 USC §§2671-2680, 28 USC §1346, and §1402(b).

2.      L.A. (hereinafter referred to as "Baby L.A." or "minor-Plaintiff") is the disabled minor-Plaintiff.

3.      KIERSTEN REESER (hereinafter "Ms. Reeser"), is a Plaintiff and is the natural mother and Next Friend of the minor-Plaintiff.

4.      Ms. Reeser was appointed Next Friend of Minor L.A. by Judge Robert H. Cleland in Case No.: 3:21-CV-11317 on June 8, 2012 (ECF No. 6).

5.      JEREMY ARMSTRONG (hereinafter "Mr. Armstrong"), is a Plaintiff and is the natural father of the minor-Plaintiff.

6.      At all times pertinent herein, L.A., Ms. Reeser, and Mr. Armstrong (collectively referred to as "The Plaintiffs") were residents of the State of Michigan, County of Jackson, within the Eastern District of Michigan.

7.      Defendant UNITED STATES OF AMERICA (hereinafter referred to as Defendant USA) is named as a Defendant pursuant to the requirements of the Federal Tort Claims Act (FTCA) 28 U.S.C. § 2671.

2

8.      During the year 2019 and at all times pertinent herein, including but not limited to on and before June 5-12, 2019, the Defendant W.A. FOOTE MEMORIAL HOSPITAL a/k/a HENRY FORD ALLEGIANCE HEALTH, (hereinafter "Defendant Hospital"), was a corporation organized and existing under and by virtue of the laws of the State of Michigan, and was engaged in the business of providing medical care (including obstetrical-gynecological and newborn services) to members of the public, including Ms. Reeser and Baby L.A., by and through its nurses, physicians, other healthcare professionals, and other actual, ostensible, and/or apparent agents, employees, and/or servants, and was doing business in the State of Michigan and the County of Jackson, within this District.

9.      That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, CENTER FOR FAMILY HEALTH (hereinafter "CFFH") was a corporation organized and existing under and by virtue of the laws of the State of Michigan, and was engaged in the business of providing medical care (including obstetrical-gynecological and newborn services) to members of the public, including Ms. Reeser and Baby L.A., by and through its nurses, physicians, other healthcare professionals, and other actual, ostensible, and/or apparent agents, employees, and/or servants, and was doing business in the State of Michigan and the County of Jackson, within this District.

10.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Defendant CHARLES EDWARD ROLLISON, D.O. (hereinafter "Defendant Rollison") was a physician, licensed to practice in the State of Michigan, and was offering to the public obstetrical and gynecological services in or near the County of Jackson and within this District.

11.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Defendant Rollison was a physician who provided care and treatment to the Plaintiffs, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while the Plaintiffs were confined at Defendant Hospital.

12.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Defendant RONALD NICHOLS, M.D. (hereinafter "Defendant Nichols") was a physician, licensed to practice in the State of Michigan, and was offering to the public obstetrical and gynecological services in or near the County of Jackson and within this District.

13.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Defendant Nichols was a physician who provided care and treatment to the Plaintiffs, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while the Plaintiffs were confined at Defendant Hospital.

14.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Alma Garlo, M.D. (hereinafter "Defendant Garlo") was a physician, licensed to practice in the State of Michigan, and was offering to the public obstetrical and gynecological services in or near the County of Jackson and within this District.

15.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Defendant Garlo was a physician who provided care and treatment to the Plaintiffs, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while the Plaintiffs were confined at Defendant Hospital.

16.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Joanne Kingsley, M.D. (hereinafter "Dr. Kingsley") was a physician, licensed

4

to practice in the State of Michigan, and was offering to the public obstetrical and gynecological services in or near the County of Jackson and within this District.

17.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Dr. Kingsley was a physician who provided care and treatment to the Plaintiffs, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while the Plaintiffs were confined at Defendant Hospital.

18.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Dana Virgo, M.D. (hereinafter "Dr. Virgo") was a physician, licensed to practice in the State of Michigan, and was offering to the public obstetrical and gynecological services in or near the County of Jackson and within this District.

19.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Dr. Virgo was a physician who provided care and treatment to the Plaintiffs, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while the Plaintiffs were confined at Defendant Hospital.

20.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Monica Hill, M.D. (hereinafter "Dr. Hill") was a physician, licensed to practice in the State of Michigan, and was offering to the public obstetrical and gynecological services in or near the County of Jackson and within this District.

21.     That during the year 2019 and at all times pertinent herein, including but not limited to June 5-12, 2019, Dr. Hill was a physician who provided care and treatment to the Plaintiffs, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while the Plaintiffs were confined at Defendant Hospital.

22.     That at all times pertinent to this Complaint, various agents of Defendant USA, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, were employed by and/or were otherwise agents of CFFH, which is a Federally Qualified Healthcare Center, and those agents of Defendant USA were acting within the scope and course of their employment and/or agency—thereby Defendant USA is vicariously liable for the acts and omissions of such healthcare professionals.

23.     The acts of negligence alleged in this Complaint all took place within this District.

24.     An administrative tort claim was submitted to the Department of Health & Human Services (DHHS) on or before November 30, 2020 and has been denied expressly or by inaction thereby exhausting Plaintiffs' administrative remedy.

25.     Jurisdiction is conferred upon this Court pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b)(1), § 1402(b), §§ 2671-2680, and § 1367(a).

26.     The amount in controversy exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000) and any minimum jurisdictional amount of this court, exclusive of interest and costs.

27.     During 2019 and at all times relevant herein, the Defendant Hospital did retain as its actual, ostensible, and/or apparent agents, servants, and/or employees, various physicians (both attendings and residents), nurses, nurse practitioners, nurse-midwives, or other healthcare professionals, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers who while acting within the course and scope of their employment, service, and/or

6

agency, did care, treat, diagnose, and/or supervise, or undertake to treat, care, diagnose, and/or supervise the care, treatment, and medical condition of Ms. Reeser, and her son, Baby L.A., both *in utero* and thereafter.

28.     That during the year 2019 and all times relevant herein, Defendant Hospital did hold itself out to the general public, and especially to Ms. Reeser and Baby L.A., that it was conducting a safe place of business, that it was competent, careful, and experienced in the care of pregnant women and newborn patients, and that it would provide medical and nursing care and treatment in accordance with the standard of practice of this and similar medical communities. Furthermore, Defendant Hospital represented that its agents and employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers would perform the proper and necessary medical care and treatment and/or labor and delivery treatment in accordance with the standards of practice of said health care providers in the same or similar circumstances as each named health care provider herein.

29.     That the Plaintiffs relied upon Defendant Hospital's representations in seeking medical care and treatment related to their labor and delivery.

30.     That during the year 2019 and at all times relevant herein, Defendant Hospital, by and through its actual, apparent, and/or ostensible agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers provided care and treatment, including but not limited to prenatal, intrapartum, neonatal, and/or

postpartum care and treatment, while Plaintiffs were confined at Defendant Hospital for labor and delivery and subsequent care.

31.     That Defendant Hospital is liable for the actions and/or inactions of its nurses, physicians, other healthcare providers, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees who provided care and treatment to the Plaintiffs, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers via *Respondeat Superior* and/or other theories of vicarious liability.

32.     That all care and treatment at any facilities within Defendant Hospital, and the selections of persons and personnel whose custody and care Ms. Reeser and Baby L.A. were under were made by Defendant Hospital, jointly, individually, or by and through its actual, ostensible, and/or apparent agents, servants, and/or employees, acting within the course and scope of their agency, service, and/or employment.

33.     That during the year 2019 and at all times relevant herein, Defendant USA, by and through CFFH, did retain as its actual, ostensible, and/or apparent agents, servants, and/or employees, various physicians (both attendings and residents), physician assistants, nurses, nurse practitioners, nurse-midwives, or other healthcare professionals, including but not limited to: Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers who while acting within the course and scope of their employment, service, and/or agency, did care, treat, diagnose, and/or

supervise, or undertake to treat, care, diagnose, and/or supervise the care, treatment, and medical condition of Ms. Reeser and her son, Baby L.A., both *in utero* and thereafter.

34. That during the year 2019 and at all times relevant herein, Defendant USA, by and through its actual, apparent, and/or ostensible agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers provided care and treatment, including but not limited to prenatal, intrapartum, neonatal, and/or postpartum care and treatment, while Plaintiffs were confined at Defendant Hospital for labor and delivery and subsequent care.

35. That Defendant USA is liable for the actions and/or inactions of its agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers pursuant to the Federal Tort Claims Act (FTCA; 28 U.S.C. §§ 2671-2680) and/or via *Respondeat Superior* or other theories of vicarious liability.

36. Ms. Reeser's and Baby L.A.'s prenatal condition and care on dates including but not limited to prior to June 10, 2019 (the date of admission for labor and delivery) was significant for risk factors including asthma, hypertension, and obesity. Despite Ms. Reeser's risk factors, Baby L.A.'s condition was reassuring throughout the prenatal period with no indication of prenatal compromise.

37. During the prenatal period it was appropriately determined that the plan of care was for Ms. Reeser to be induced to deliver at 38-39 weeks gestation.

9

38.     On May 28, 2019, Ms. Reeser underwent a non-stress test (NST) at 37w3d gestation, which was interpreted as being reactive.

39.     On May 31, 2019, Ms. Reeser underwent a non-stress test (NST) at 37w6d gestation, which was interpreted as being reactive.

40.     Ms. Reeser was seen on multiple occasions during the period of 38-39 weeks gestation, including but not limited to by Alma Garlo, M.D. on June 5, 2019 and by Joanne Kingsley, M.D. on June 7, 2019, yet she was not induced as had appropriately been decided upon and as was required by the standard of care.

41.     On June 5, 2019 Ms. Reeser underwent a non-stress test (NST) at 38w4d gestation, which was interpreted as being non-reactive, as well as a biophysical profile (BPP) which was scored 8/8. Ms. Reeser was not induced on this date and was discharged home.

42.     On June 7, 2019 Ms. Reeser underwent a non-stress test (NST) at 38w6d gestation, which was interpreted as being reactive, and was noted to have elevated blood pressure. Ms. Reeser was not induced on this date and was discharged home.

43.     Had Ms. Reeser been induced earlier as previously decided upon, Baby L.A. would have been born earlier and would have avoided the brain damage and hypoxic ischemic encephalopathy that he eventually suffered during labor and delivery. Instead, Ms. Reeser was discharged home and instructed to return at a later date, which was inappropriate and below the standard of care.

44.     At or about 07:58 on June 10, 2019 Ms. Reeser, with Baby L.A. *in utero*, presented to Defendant Hospital for an induction of labor. At the time of admission Ms. Reeser was 19 years of age, G2P0 and at about 39w2d gestation.

45.     At or about 08:24 on June 10, 2019 electronic fetal monitoring (EFM) was initiated.

46.     At or about 09:26 on June 10, 2019 Dana Virgo, M.D. authored an admission History & Physical and appreciated the following: "Kiersten E. Reeser is a 19 y.o. at 39w2d who presents for Induction of labor and Other (Comment) for chronic hypertension. Active fetus Yes…FHT's 130s, minimal variability, no decelerations initially; now moderate variability with accelerations. Vtx by exam and recent ultrasound; EFW 3800 grams. Contractions: none. VE per RN: 1/50/high/posterior…Impression: G2P0010 @ 39w2d by 6 week ultrasound. CAT2 FHT, currently improving with better variability. Reason for admission: Other (Comment)- chronic hypertension for 39 week IOL. Plan: Admit to inpatient. Discussed cervical ripening at length. Misoprostol 25mcg placed vaginally. PIH labs ordered."

47.     At or about 19:16 on June 10, 2019 Laura Horka, R.N. noted the following "Talked with Dr. Virgo about the patient contraction pattern and she reviewed the strip. Dr. Virgo requested another Cytotec to be placed."

48.     At or about 19:41 on June 10, 2019 nurse Horka performed a vaginal examination and appreciated Ms. Reeser to be 1cm dilation / 40% effacement / -2 station.

49.     At or about 10:52 on June 11, 2019 Ashley Savicke, R.N. began titrating Pitocin at 1mu/min. Pitocin continued to be administered for much of the remainder of this labor including but not limited to as follows:

| Date/Time | Pitocin Dosage |
|---|---|
| 06/11/19 at 11:30 | Pitocin increased to 2mu/min |
| 6/11/19 at 12:20 | Pitocin increased to 4mu/min |
| 6/11/19 at 13:10 | Pitocin increased to 6mu/min |
| 6/11/19 at 13:40 | Pitocin increased to 8mu/min |
| 6/11/19 at 18:24 | Pitocin increased to 10mu/min |
| 6/11/19 at 18:50 | Pitocin decreased to 5mu/min |
| 6/11/19 at 21:50 | Pitocin increased to 6mu/min |
| 6/11/19 at 23:14 | Pitocin increased to 7mu/min |
| 6/12/19 at 00:25 | Pitocin increased to 8mu/min |
| 6/12/19 at 01:25 | Pitocin increased to 9mu/min |
| 6/12/19 at 03:30 | Pitocin increased to 10mu/min |

| 6/12/19 at 05:00 | Pitocin increased to 11mu/min |
| 6/12/19 at 07:27 | Pitocin increased to 12mu/min |

50.     At or about 14:30 on June 11, 2019 Ashley Savicke, R.N. noted the following: fetal movement active, intermittent auscultation using Doppler, FHR baseline 130bpm, "no audible decels before, during, or after contraction," Nurse Savicke also authored a note indicating that at or about this time "unable to increase pitocin at this time as patient is in the jacuzzi tub and tracing with Novii is poor. Plan to auscultate fetal heart tones with fetal doppler device."

51.     Ashley Savicke, R.N. noted that at or about 15:20 on June 11, 2019 "RN contacted physician to request internal monitoring. Physician declined at this time."

52.     At or about 18:45 on June 11, 2019 Ashley Booth, R.N. noted that "Updated Dr. Nichols on patient's fetal tracing showing late decelerations. Pitocin turned down to 5 milliunits, patient repositioned onto left side. Dr. Nichols will review and continue to monitor."

53.     At or about 19:55 on June 11, 2019 Laura Horka, R.N. noted that "Dr. Nichols called to update about the patients states and SVE. He is on his way in to the hospital at this time." At or about 20:00 nurse Horka noted the following: fetal movement active, FHR baseline 145bpm, minimal FHR variability, absent FHR accelerations, and late FHR decelerations.

54.     At or about 06:00 on D.O.B., 2019, Laura Horka, R.N. noted that she conducted a vaginal examination and appreciated Ms. Reeser to be 10cm dilated / 100% effaced / 0 station. At or about 06:05 on June 12, 2019 Laura Horka, R.N. noted the following: "Called Dr. Nichols to update on patient SVE."

55.     At or about 07:00 on June 12, 2019 Jennifer Rice, R.N. noted the following: "Dr. Nichols at bedside, strip reviewed, FSE placed by physician, continue to monitor."

56.     At or about 07:15 Nurse Rice noted the following: FHR baseline 170bpm, tachycardia, minimal FHR variability, variable FHR decelerations, and contraction frequency 3-4.

57.     At or about 07:25 on D.O.B., 2019, "Dr. Nichols reviewed strip, ordered received to decrease epidural by half and begin pushing with pt."

58.     Monica Hill, M.D. authored a note describing the following events prior to delivery: "Arrived to L+D around 810AM. Went to relieve Dr. Nichols and get sound out. Dr. Nichols was in room 411. We stepped out for brief sign out in regards to deep variable with recovery and reassuring strip at this time. He call her complete and +1. Went to evaluate other patient and have brief discussion on plan of care, as 411 looked stable at this time. Called to room around 0830 due to fetal deceleration noted. Discussed options with patient as baby has recovered at this point. Had not pushed at all with patient. Went back into room to access maternal effort and decent with push. Deceleration noted with pushing. Request for cesarean was made to nursing around 0838. Dr. Rollison notified by staff. Discussed possible vacuum with Dr. Rollison due to the low fetal station. Dr. Rollison evaluated patient. Decision made to proceed with cesarean. CRNA was already at bedside and MD was enroute. Fetal Delivery was 0907 under general anesthesia."

59.     Baby L.A. was eventually born via cesarean section at Defendant Hospital on D.O.B. at or about 09:07 at or about 39w4d gestation and with measurements including weight 3780g and head circumference 35cm.

60.     At birth Baby L.A. was depressed, flaccid, apneic, bradycardic, with no spontaneous respirations, and with no reflexes. Baby L.A. was assigned APGAR scores of 2, 2, 2, and 3 at 1, 5, 10, and 15 minutes respectively.

61.     Baby L.A. required aggressive resuscitation including but not limited to suctioning, tactile stimulation, positive pressure ventilation (PPV), and intubation.

62.     Baby L.A.'s cord blood was sampled and analyzed, with reported values including pH 6.82, HCO3 17.5, and base excess -24 – which is reflective of significant metabolic acidosis.

63.     Following his birth, Baby L.A. was transferred to Henry Ford Hospital in Detroit for management in the Neonatal Intensive Care Unit (NICU).

64.     Following his transport, Baby L.A. was correctly enrolled in neuroprotective hypothermia (a/k/a cooling) therapy to treat his hypoxic ischemic encephalopathy (HIE).

65.     At or about 14:27 on June 13, 2019, Baby L.A. underwent a head ultrasound wherein the treating physician appreciated the following: "…Within the limitations of the exam, the RI's are abnormally low at 0.54 and 0.59 (normal 0.6 – 0.9) suggestive of hypoxic ischemic event…"

66.     At or about 08:27 on June 17, 2019, Baby L.A. underwent a brain MRI wherein the treating physician appreciated the following: "There are findings to suggest hypoxic ischemic encephalopathy involving the cerebral hemispheres bilaterally as described above. There is also symmetric small focal areas of restricted diffusion identified in the region of the posterior limbs of the internal capsules bilaterally to suggest small areas of ischemia…"

67.     Baby L.A. remained admitted in the NICU at Henry Ford Hospital in Detroit until June 20, 2019, wherein he received diagnoses including Respiratory failure of newborn, convulsions of newborn, seizures, and Hypoxic Ischemic Encephalopathy (HIE).

68.     During Ms. Reeser's labor, non-reassuring findings became apparent and the patients' clinical condition deteriorated, which required changes in the plan of care and/or advocacy for changes in the plan of care, including but not limited to intrauterine resuscitation measures, discontinuation of Pitocin, use of internal monitors, abandonment of attempts at vaginal

14

delivery, and earlier delivery via cesarean section – which were not done and were below the standard of care.

69.     Had Ms. Reeser and Baby L.A. been provided appropriate care and treatment during the prenatal period and labor and delivery period, Baby L.A. would have avoided hypoxic-ischemic brain damage and would be neurologically intact. Instead, he suffered permanent and severe brain damage.

70.     As a direct and proximate result of his hypoxic-ischemic brain damage, Baby L.A. is permanently disabled and currently has Cerebral Palsy, developmental delay, motor and mental impairment, and requires extensive medical/therapeutic services. Upon information and belief, Baby L.A. will require extensive care and treatment for the rest of his life, will never be capable of making independent, responsible life decisions, will never be capable of independently performing activities of daily living, and is unlikely to be competitively employed.

71.     In addition to Baby L.A.'s injuries, Ms. Reeser also incurred personal injuries as a direct and proximate result of the deviations from the standard of care during her delivery, including but not limited to unnecessary surgical intervention, and a prolonged stay in the hospital away from her critically-ill newborn.

72.     Following Ms. Reeser's Cesarean Section, the healthcare providers erroneously believed that a foreign object was retained in Ms. Reeser's body and therefore performed additional surgical intervention to remove a suspected retained object. However, no retained foreign object in fact existed.

73.     The healthcare providers also erroneously believed that Ms. Reeser's bladder or other organs were injured and therefore performed further additional and unnecessary surgical

intervention including but not limited to an exploratory laparotomy. However, no bladder or other organ injury in fact existed.

74.    Had the healthcare providers provided Ms. Reeser with appropriate care and treatment during her delivery, she would have avoided injury. Instead, she was forced to undergo additional unnecessary surgical intervention and a prolonged stay in the hospital away from her critically-ill newborn baby.

## COUNT I
### Medical Negligence – Defendant USA

75.    The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

76.    During the year 2019 and at all times relevant herein Defendant USA was offering to the public obstetrical-gynecological services by and through its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers within Jackson County, Michigan and within this District.

77.    On or about June 5-12, 2019 and at all times relevant herein, Defendant USA, by and through its nurses, physicians, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, did undertake the care and treatment of Ms. Reeser and Baby L.A., *both in*

*utero* and thereafter, during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

78.     On or about June 5-12, 2019 and at all times relevant herein, it then and there became the duty of the Defendant USA, by and through its nurses, physicians, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, to render health care services consistent with the medical requirements of the patients Ms. Reeser and Baby L.A., and to possess and apply that degree of care, treatment, and skill commonly exercised by other healthcare providers and facilities in the same or similar circumstances and to avoid harm.

79.     After assuming the care and treatment of Ms. Reeser and Baby L.A. on June 5-12, 2019, Defendant USA, by and through its nurses, physicians, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, and each individually, were then and there guilty of one or more of the following negligent acts and/or omissions:

    a. Failure to appropriately manage the patient's prenatal care and/or this labor and delivery;
    b. Failure to obtain appropriate informed consent and/or appropriately advise the patients regarding their status, appropriate course(s) of action, and/or all pertinent risks;
    c. Failure to carefully, timely, and adequately examine and assess the patients to determine the status of both mother and unborn baby;
    d. Failure to carefully recommend and provide appropriate prenatal surveillance and/or care to ensure the continued wellbeing of the baby, and timely induce and/or deliver the baby to avoid the risk of intrauterine compromise;

17

e.  Failure to be aware of the increased risks attendant to the pregnancy, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, possible preeclampsia or hypertensive disorder, abnormal progression of labor, and/or abnormal fetal heart tones;

f.  Failure to be aware of, understand, and/or appreciate the risks of neurologic injury from hypoxia-ischemia and take appropriate action to avoid the same;

g.  Failure to carefully and completely advise the patient of the risks inherent to this delivery, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, and/or possible preeclampsia or hypertensive disorder;

h.  Failure to perform appropriate and necessary intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene sooner;

i.  Failure to closely and sufficiently monitor the maternal and/or fetal status, including but not limited via the use of an intrauterine pressure catheter and/or fetal scalp electrode;

j.  Failure to accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate findings and/or changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, information of the physician, all other actions taken, and/or pertinent information;

k.  Failure to carefully assess for, recognize, and/or treat non-reassuring developments during labor and deliver including but not limited to abnormal progression of labor, abnormal vital signs, excessive uterine activity, fetal heartrate decelerations, and/or decreased fetal heartrate variability, and treat for the same including intrauterine resuscitation measures, intravenous fluids, repositioning, oxygen, discontinuation of Pitocin, timely notify the patients' provider(s) or physician(s) including notification of a surgical team, and advocate for and/or perform earlier delivery via C-section;

l.  Failure to be aware and/or appreciate that the non-reassuring changes in the patients' condition can and did reflect a baby who was at risk for developing hypoxia-ischemia and suffering neurologic injury;

m.  Failure to carefully discuss and/or monitor the condition of mother and baby so as to avoid the intrapartum development of hypoxia/ischemia;

n.  Failure to carefully and completely advise the patient and her caregivers of the maternal condition, and that of her unborn baby, including but not limited to the unreasonable hazard of continued labor under the circumstances then and there existing as well as the risk for permanent neurological injury, and advocate for and/or initiate changes in the plan of care including a cesarean section;

o.  Failure to timely and adequately communicate among other healthcare professionals regarding the status of mother and unborn baby, including advocacy for and/or initiation of changes in the plan of care;

p.  Failure to advocate for changes in the plan of care and, if necessary, utilize the chain of command to effectuate the same;

q.  Failure to be aware of the risks of and/or avoid injudicious use of induction agents including Pitocin (Oxytocin);

r.  Failure to timely and adequately inform and/or mobilize the necessary surgical staff to perform a timely delivery;

s.  Failure to timely advocate for and/or perform timely cesarean section;

t.  Failure to perform surgery properly and competently;

u.  Failure to carefully avoid unnecessary surgical intervention following the delivery of the baby;

v.  Failure to carefully ensure accurate surgical counts and/or rule out a suspected retained object without unnecessary surgical intervention;

w.  Failure to carefully avoid iatrogenic injury during surgery and/or rule out the same without unnecessary surgical intervention;

x.  Failure to promulgate, implement, maintain, and/or follow appropriate policies, procedures and protocols for nurses and staff caring for pregnant mothers, their unborn babies, and/or newborn babies;

80.     Reasonably prudent healthcare professionals and facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

81.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

82.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

83.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

84.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

85.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

86.     As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

   a.   pain and suffering;
   b.   disfigurement and deformity;
   c.   mental and emotional injuries;
   d.   extensive medical expenses, both past and future;
   e.   brain damage/encephalopathy;
   f.   seizures;
   g.   mental status changes;
   h.   developmental delay;
   i.   tremendous pain and suffering;
   j.   disability;
   k.   mental anguish;
   l.   future pain and suffering;
   m.  future mental anguish;
   n.   loss of employability;
   o.   loss of earning capacity;
   p.   costs and expenses for the extraordinary care required by Plaintiff-minor;
   q.   severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or
   r.   all other damages permitted by law.

87.     As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.

## COUNT II
### Medical Negligence – Defendant Hospital

88.     The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

89.     During the year 2019 and at all times relevant herein Defendant Hospital was offering to the public obstetrical-gynecological services by and through its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers within Jackson County, Michigan and within this District.

90.     On or about June 5-12, 2019 and at all times relevant herein, Defendant Hospital, by and through its nurses, physicians, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, did undertake the care and treatment of Ms. Reeser and Baby L.A., both *in utero* and thereafter, during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

91.     On or about June 5-12, 2019 and at all times relevant herein, it then and there became the duty of the Defendant Hospital, by and through its nurses, physicians, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, to render health care services consistent with the medical requirements of the patients Ms. Reeser and Baby L.A., and

21

to possess and apply that degree of care, treatment, and skill commonly exercised by other healthcare providers and facilities in the same or similar circumstances and to avoid harm.

92.     After assuming the care and treatment of Ms. Reeser and Baby L.A. on June 5-12, 2019, Defendant Hospital, by and through its nurses, physicians, as well as its actual, ostensible, and/or apparent agents, servants, and/or employees including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers, and each individually, were then and there guilty of one or more of the following negligent acts and/or omissions:

a.  Failure to appropriately manage the patient's prenatal care and/or this labor and delivery;
b.  Failure to obtain appropriate informed consent and/or appropriately advise the patients regarding their status, appropriate course(s) of action, and/or all pertinent risks;
c.  Failure to carefully, timely, and adequately examine and assess the patients to determine the status of both mother and unborn baby;
d.  Failure to carefully recommend and provide appropriate prenatal surveillance and/or care to ensure the continued wellbeing of the baby, and timely induce and/or deliver the baby to avoid the risk of intrauterine compromise;
e.  Failure to be aware of the increased risks attendant to the pregnancy, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, possible preeclampsia or hypertensive disorder, abnormal progression of labor, and/or abnormal fetal heart tones;
f.  Failure to be aware of, understand, and/or appreciate the risks of neurologic injury from hypoxia-ischemia and take appropriate action to avoid the same;
g.  Failure to carefully and completely advise the patient of the risks inherent to this delivery, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, and/or possible preeclampsia or hypertensive disorder;
h.  Failure to perform appropriate and necessary intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene sooner;
i.  Failure to closely and sufficiently monitor the maternal and/or fetal status, including but not limited via the use of an intrauterine pressure catheter and/or fetal scalp electrode;
j.  Failure to accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate findings and/or changes,

interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, information of the physician, all other actions taken, and/or pertinent information;

k.  Failure to carefully assess for, recognize, and/or treat non-reassuring developments during labor and deliver including but not limited to abnormal progression of labor, abnormal vital signs, excessive uterine activity, fetal heartrate decelerations, and/or decreased fetal heartrate variability, and treat for the same including intrauterine resuscitation measures, intravenous fluids, repositioning, oxygen, discontinuation of Pitocin, timely notify the patients' provider(s) or physician(s) including notification of a surgical team, and advocate for and/or perform earlier delivery via C-section;

l.  Failure to be aware and/or appreciate that the non-reassuring changes in the patients' condition can and did reflect a baby who was at risk for developing hypoxia-ischemia and suffering neurologic injury;

m.  Failure to carefully discuss and/or monitor the condition of mother and baby so as to avoid the intrapartum development of hypoxia/ischemia;

n.  Failure to carefully and completely advise the patient and her caregivers of the maternal condition, and that of her unborn baby, including but not limited to the unreasonable hazard of continued labor under the circumstances then and there existing as well as the risk for permanent neurological injury, and advocate for and/or initiate changes in the plan of care including a cesarean section;

o.  Failure to timely and adequately communicate among other healthcare professionals regarding the status of mother and unborn baby, including advocacy for and/or initiation of changes in the plan of care;

p.  Failure to advocate for changes in the plan of care and, if necessary, utilize the chain of command to effectuate the same;

q.  Failure to be aware of the risks of and/or avoid injudicious use of induction agents including Pitocin (Oxytocin);

r.  Failure to timely and adequately inform and/or mobilize the necessary surgical staff to perform a timely delivery;

s.  Failure to timely advocate for and/or perform timely cesarean section;

t.  Failure to perform surgery properly and competently;

u.  Failure to carefully avoid unnecessary surgical intervention following the delivery of the baby;

v.  Failure to carefully ensure accurate surgical counts and/or rule out a suspected retained object without unnecessary surgical intervention;

w.  Failure to carefully avoid iatrogenic injury during surgery and/or rule out the same without unnecessary surgical intervention;

x.  Failure to promulgate, implement, maintain, and/or follow appropriate policies, procedures and protocols for nurses and staff caring for pregnant mothers, their unborn babies, and/or newborn babies;

93.     Reasonably prudent healthcare professionals and facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

94.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

95.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

96.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

97.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

98.     As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

99.     As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

      a.  pain and suffering;
      b.  disfigurement and deformity;
      c.  mental and emotional injuries;
      d.  extensive medical expenses, both past and future;
      e.  brain damage/encephalopathy;
      f.  seizures;

g.  mental status changes;
h.  developmental delay;
i.  tremendous pain and suffering;
j.  disability;
k.  mental anguish;
l.  future pain and suffering;
m.  future mental anguish;
n.  loss of employability;
o.  loss of earning capacity;
p.  costs and expenses for the extraordinary care required by Plaintiff-minor;
q.  severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or
r.  all other damages permitted by law.

100.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.

<u>**COUNT III**</u>
<u>**Medical Negligence – Defendant Nichols**</u>

101.    The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

102.    During the year 2019 and at all times relevant herein Defendant Nichols was offering to the public obstetrical-gynecological services within Jackson County, Michigan and within this District.

103.    During the year 2019, including on or about June 5-12, 2019 and at all times relevant herein, Defendant Nichols did undertake the care and treatment of Ms. Reeser and Baby L.A., both *in utero* and thereafter, during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

104. On or about June 5-12, 2019 and at all times relevant herein, it then and there became the duty of the Defendant Nichols, individually, to render health care services consistent with the medical requirements of the patients Ms. Reeser and Baby L.A., and to possess and apply that degree of care, treatment, and skill commonly exercised by other healthcare providers and facilities in the same or similar circumstances and to avoid harm.

105. After assuming the care and treatment of Ms. Reeser and Baby L.A. on June 5-12, 2019, Defendant Nichols, individually, was then and there guilty of one or more of the following negligent acts and/or omissions:

    a. Failure to appropriately manage the patient's prenatal care and/or this labor and delivery;

    b. Failure to obtain appropriate informed consent and/or appropriately advise the patients regarding their status, appropriate course(s) of action, and/or all pertinent risks;

    c. Failure to carefully, timely, and adequately examine and assess the patients to determine the status of both mother and unborn baby;

    d. Failure to carefully recommend and provide appropriate prenatal surveillance and/or care to ensure the continued wellbeing of the baby, and timely induce and/or deliver the baby to avoid the risk of intrauterine compromise;

    e. Failure to be aware of the increased risks attendant to the pregnancy, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, possible preeclampsia or hypertensive disorder, abnormal progression of labor, and/or abnormal fetal heart tones;

    f. Failure to be aware of, understand, and/or appreciate the risks of neurologic injury from hypoxia-ischemia and take appropriate action to avoid the same;

    g. Failure to carefully and completely advise the patient of the risks inherent to this delivery, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, and/or possible preeclampsia or hypertensive disorder;

    h. Failure to perform appropriate and necessary intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene sooner;

    i. Failure to closely and sufficiently monitor the maternal and/or fetal status, including but not limited via the use of an intrauterine pressure catheter and/or fetal scalp electrode;

    j. Failure to accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate findings and/or changes, interventions taken to improve the condition of the unborn baby, the progress of

labor, vital signs, information of the physician, all other actions taken, and/or pertinent information;

k. Failure to carefully assess for, recognize, and/or treat non-reassuring developments during labor and deliver including but not limited to abnormal progression of labor, abnormal vital signs, excessive uterine activity, fetal heartrate decelerations, and/or decreased fetal heartrate variability, and treat for the same including intrauterine resuscitation measures, intravenous fluids, repositioning, oxygen, discontinuation of Pitocin, timely notify the patients' provider(s) or physician(s) including notification of a surgical team, and advocate for and/or perform earlier delivery via C-section;

l. Failure to be aware and/or appreciate that the non-reassuring changes in the patients' condition can and did reflect a baby who was at risk for developing hypoxia-ischemia and suffering neurologic injury;

m. Failure to carefully discuss and/or monitor the condition of mother and baby so as to avoid the intrapartum development of hypoxia/ischemia;

n. Failure to carefully and completely advise the patient and her caregivers of the maternal condition, and that of her unborn baby, including but not limited to the unreasonable hazard of continued labor under the circumstances then and there existing as well as the risk for permanent neurological injury, and advocate for and/or initiate changes in the plan of care including a cesarean section;

o. Failure to timely and adequately communicate among other healthcare professionals regarding the status of mother and unborn baby, including advocacy for and/or initiation of changes in the plan of care;

p. Failure to be aware of the risks of and/or avoid injudicious use of induction agents including Pitocin (Oxytocin);

q. Failure to timely and adequately inform and/or mobilize the necessary surgical staff to perform a timely delivery;

r. Failure to timely advocate for and/or initiate changes in the plan of care, including but not limited to timely cesarean section;

s. Failure to promulgate, implement, maintain, and/or follow appropriate policies, procedures and protocols for nurses and staff caring for pregnant mothers, their unborn babies, and/or newborn babies;

106. Reasonably prudent healthcare professionals and facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

107. As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

108.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

109.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

110.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

111.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

112.    As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

      a.   pain and suffering;
      b.   disfigurement and deformity;
      c.   mental and emotional injuries;
      d.   extensive medical expenses, both past and future;
      e.   brain damage/encephalopathy;
      f.   seizures;
      g.   mental status changes;
      h.   developmental delay;
      i.   tremendous pain and suffering;
      j.   disability;
      k.   mental anguish;
      l.   future pain and suffering;
      m.   future mental anguish;
      n.   loss of employability;
      o.   loss of earning capacity;
      p.   costs and expenses for the extraordinary care required by Plaintiff-minor;

q. severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or

r. all other damages permitted by law.

113.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.

## COUNT IV
## Medical Negligence – Defendant Rollison

114.    The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

115.    During the year 2019 and at all times relevant herein Defendant Rollison was offering to the public obstetrical-gynecological services within Jackson County, Michigan and within this District.

116.    On or about June 5-12, 2019 and at all times relevant herein, Defendant Rollison did undertake the care and treatment of Ms. Reeser and Baby L.A., both *in utero* and thereafter, during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

117.    On or about June 5-12, 2019 and at all times relevant herein, it then and there became the duty of the Defendant Rollison, individually, to render health care services consistent with the medical requirements of the patients Ms. Reeser and Baby L.A., and to possess and apply that degree of care, treatment, and skill commonly exercised by other healthcare providers and facilities in the same or similar circumstances and to avoid harm.

118.   After assuming the care and treatment of Ms. Reeser and Baby L.A. on June 5-12,

2019, Defendant Rollison, individually, was then and there guilty of one or more of the following

negligent acts and/or omissions:

    a.   Failure to appropriately manage the patient's prenatal care and/or this labor and delivery;

    b.   Failure to obtain appropriate informed consent and/or appropriately advise the patients regarding their status, appropriate course(s) of action, and/or all pertinent risks;

    c.   Failure to carefully, timely, and adequately examine and assess the patients to determine the status of both mother and unborn baby;

    d.   Failure to carefully recommend and provide appropriate prenatal surveillance and/or care to ensure the continued wellbeing of the baby, and timely induce and/or deliver the baby to avoid the risk of intrauterine compromise;

    e.   Failure to be aware of the increased risks attendant to the pregnancy, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, possible preeclampsia or hypertensive disorder, abnormal progression of labor, and/or abnormal fetal heart tones;

    f.   Failure to be aware of, understand, and/or appreciate the risks of neurologic injury from hypoxia-ischemia and take appropriate action to avoid the same;

    g.   Failure to carefully and completely advise the patient of the risks inherent to this delivery, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, and/or possible preeclampsia or hypertensive disorder;

    h.   Failure to perform appropriate and necessary intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene sooner;

    i.   Failure to closely and sufficiently monitor the maternal and/or fetal status, including but not limited via the use of an intrauterine pressure catheter and/or fetal scalp electrode;

    j.   Failure to accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate findings and/or changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, information of the physician, all other actions taken, and/or pertinent information;

    k.   Failure to carefully assess for, recognize, and/or treat non-reassuring developments during labor and deliver including but not limited to abnormal progression of labor, abnormal vital signs, excessive uterine activity, fetal heartrate decelerations, and/or decreased fetal heartrate variability, and treat for the same including intrauterine resuscitation measures, intravenous fluids, repositioning, oxygen, discontinuation of Pitocin, timely notify the patients' provider(s) or physician(s) including notification of a surgical team, and advocate for and/or perform earlier delivery via C-section;

l.  Failure to be aware and/or appreciate that the non-reassuring changes in the patients' condition can and did reflect a baby who was at risk for developing hypoxia-ischemia and suffering neurologic injury;

m.  Failure to carefully discuss and/or monitor the condition of mother and baby so as to avoid the intrapartum development of hypoxia/ischemia;

n.  Failure to carefully and completely advise the patient and her caregivers of the maternal condition, and that of her unborn baby, including but not limited to the unreasonable hazard of continued labor under the circumstances then and there existing as well as the risk for permanent neurological injury, and advocate for and/or initiate changes in the plan of care including a cesarean section;

o.  Failure to timely and adequately communicate among other healthcare professionals regarding the status of mother and unborn baby, including advocacy for and/or initiation of changes in the plan of care;

p.  Failure to be aware of the risks of and/or avoid injudicious use of induction agents including Pitocin (Oxytocin);

q.  Failure to timely and adequately inform and/or mobilize the necessary surgical staff to perform a timely delivery;

r.  Failure to timely advocate for and/or initiate changes in the plan of care, including but not limited to timely cesarean section;

s.  Failure to perform surgery properly and competently;

t.  Failure to carefully avoid unnecessary surgical intervention following the delivery of the baby;

u.  Failure to carefully ensure accurate surgical counts and/or rule out a suspected retained object without unnecessary surgical intervention;

v.  Failure to carefully avoid iatrogenic injury during surgery and/or rule out the same without unnecessary surgical intervention;

w.  Failure to promulgate, implement, maintain, and/or follow appropriate policies, procedures and protocols for nurses and staff caring for pregnant mothers, their unborn babies, and/or newborn babies;

119.   Reasonably prudent healthcare professionals and facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

120.   As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

121.   As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

31

122.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

123.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

124.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

125.    As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

      a.  pain and suffering;
      b.  disfigurement and deformity;
      c.  mental and emotional injuries;
      d.  extensive medical expenses, both past and future;
      e.  brain damage/encephalopathy;
      f.  seizures;
      g.  mental status changes;
      h.  developmental delay;
      i.  tremendous pain and suffering;
      j.  disability;
      k.  mental anguish;
      l.  future pain and suffering;
      m.  future mental anguish;
      n.  loss of employability;
      o.  loss of earning capacity;
      p.  costs and expenses for the extraordinary care required by Plaintiff-minor;
      q.  severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or
      r.  all other damages permitted by law.

126.     As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.

## COUNT V
## Medical Negligence – Defendant Garlo

127.     The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

128.     During the year 2019 and at all times relevant herein Defendant Garlo was offering to the public obstetrical-gynecological services within Jackson County, Michigan and within this District.

129.     During the year 2019, including on or about June 5-12, 2019 and at all times relevant herein, Defendant Garlo did undertake the care and treatment of Ms. Reeser and Baby L.A., both *in utero* and thereafter, during the course of the prenatal, intrapartum, neonatal, and/or postpartum periods.

130.     On or about June 5-12, 2019 and at all times relevant herein, it then and there became the duty of the Defendant Garlo, individually, to render health care services consistent with the medical requirements of the patients Ms. Reeser and Baby L.A., and to possess and apply that degree of care, treatment, and skill commonly exercised by other healthcare providers and facilities in the same or similar circumstances and to avoid harm.

131.     After assuming the care and treatment of Ms. Reeser and Baby L.A. on June 5-12, 2019, Defendant Garlo, individually, was then and there guilty of one or more of the following negligent acts and/or omissions:

33

a. Failure to appropriately manage the patient's prenatal care and/or this labor and delivery;

b. Failure to obtain appropriate informed consent and/or appropriately advise the patients regarding their status, appropriate course(s) of action, and/or all pertinent risks;

c. Failure to carefully, timely, and adequately examine and assess the patients to determine the status of both mother and unborn baby;

d. Failure to carefully recommend and provide appropriate prenatal surveillance and/or care to ensure the continued wellbeing of the baby, and timely induce and/or deliver the baby to avoid the risk of intrauterine compromise;

e. Failure to be aware of the increased risks attendant to the pregnancy, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, possible preeclampsia or hypertensive disorder, abnormal progression of labor, and/or abnormal fetal heart tones;

f. Failure to be aware of, understand, and/or appreciate the risks of neurologic injury from hypoxia-ischemia and take appropriate action to avoid the same;

g. Failure to carefully and completely advise the patient of the risks inherent to this delivery, including but not limited to obesity, hypertension, non-reactive non-stress test, abnormal laboratory values, and/or possible preeclampsia or hypertensive disorder;

h. Failure to perform appropriate and necessary intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene sooner;

i. Failure to closely and sufficiently monitor the maternal and/or fetal status, including but not limited via the use of an intrauterine pressure catheter and/or fetal scalp electrode;

j. Failure to accurately and thoroughly record in the medical records all pertinent aspects of the condition of the unborn baby and care provided, including recognition and charting of non-reassuring heart rate findings and/or changes, interventions taken to improve the condition of the unborn baby, the progress of labor, vital signs, information of the physician, all other actions taken, and/or pertinent information;

k. Failure to carefully assess for, recognize, and/or treat non-reassuring developments during labor and deliver including but not limited to abnormal progression of labor, abnormal vital signs, excessive uterine activity, fetal heartrate decelerations, and/or decreased fetal heartrate variability, and treat for the same including intrauterine resuscitation measures, intravenous fluids, repositioning, oxygen, discontinuation of Pitocin, timely notify the patients' provider(s) or physician(s) including notification of a surgical team, and advocate for and/or perform earlier delivery via C-section;

l. Failure to be aware and/or appreciate that the non-reassuring changes in the patients' condition can and did reflect a baby who was at risk for developing hypoxia-ischemia and suffering neurologic injury;

m. Failure to carefully discuss and/or monitor the condition of mother and baby so as to avoid the intrapartum development of hypoxia/ischemia;

n. Failure to carefully and completely advise the patient and her caregivers of the maternal condition, and that of her unborn baby, including but not limited to the

unreasonable hazard of continued labor under the circumstances then and there existing as well as the risk for permanent neurological injury, and advocate for and/or initiate changes in the plan of care including a cesarean section;

o. Failure to timely and adequately communicate among other healthcare professionals regarding the status of mother and unborn baby, including advocacy for and/or initiation of changes in the plan of care;

p. Failure to be aware of the risks of and/or avoid injudicious use of induction agents including Pitocin (Oxytocin);

q. Failure to timely and adequately inform and/or mobilize the necessary surgical staff to perform a timely delivery;

r. Failure to timely advocate for and/or initiate changes in the plan of care, including but not limited to timely cesarean section;

s. Failure to promulgate, implement, maintain, and/or follow appropriate policies, procedures and protocols for nurses and staff caring for pregnant mothers, their unborn babies, and/or newborn babies;

132. Reasonably prudent healthcare professionals and facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

133. As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

134. As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

135. As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

136. As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

137.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

138.    As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

     a.   pain and suffering;
     b.   disfigurement and deformity;
     c.   mental and emotional injuries;
     d.   extensive medical expenses, both past and future;
     e.   brain damage/encephalopathy;
     f.   seizures;
     g.   mental status changes;
     h.   developmental delay;
     i.   tremendous pain and suffering;
     j.   disability;
     k.   mental anguish;
     l.   future pain and suffering;
     m.   future mental anguish;
     n.   loss of employability;
     o.   loss of earning capacity;
     p.   costs and expenses for the extraordinary care required by Plaintiff-minor;
     q.   severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or
     r.   all other damages permitted by law.

139.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.

## COUNT VI
### Negligent Selection, Retention, Training, & Supervision – Defendant Hospital

140.    The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

141.     That Defendant Hospital had a duty to Ms. Reeser and Baby L.A. to select, hire, credential, and/or retain only competent physicians, residents, nurses, nurse-midwives, and/or other healthcare professionals to ensure that care and treatment would be provided accordance with accepted standards of medical practice, and to ensure that its actual, ostensible, and/or apparent agents, servants, and/or employees dealt properly with any complications that might arise in accordance with accepted standards of medical practice.

142.     That Defendant Hospital had a duty to Ms. Reeser and Baby L.A. to provide appropriate training and supervision to its physicians, residents, nurses, nurse-midwives, and/or other healthcare professionals to ensure that care and treatment would be provided in accordance with accepted standards of medical practice, and to ensure that its actual, ostensible, and/or apparent agents, servants, and/or employees dealt properly with any complications that might arise in accordance with accepted standards of medical practice.

143.     That Defendant Hospital breached its duty to Ms. Reeser and Baby L.A. and failed to meet the standard of reasonable care in the selection, hiring, credentialing, and/or retention of its actual, ostensible, and/or apparent agents, servants, and/or employees, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers.

144.     That Defendant Hospital breached its duty to Ms. Reeser and Baby L.A. and failed to meet the standard of reasonable care in the training and supervision of its actual, ostensible, and/or apparent agents, servants, and/or employees, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo,

M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.;

Ashley S. Booth, R.N.; and/or other healthcare providers.

145.    Reasonably prudent healthcare facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

146.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

147.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

148.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

149.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

150.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

151.    As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

    a.  pain and suffering;
    b.  disfigurement and deformity;
    c.  mental and emotional injuries;
    d.  extensive medical expenses, both past and future;

e.  brain damage/encephalopathy;
f.  seizures;
g.  mental status changes;
h.  developmental delay;
i.  tremendous pain and suffering;
j.  disability;
k.  mental anguish;
l.  future pain and suffering;
m.  future mental anguish;
n.  loss of employability;
o.  loss of earning capacity;
p.  costs and expenses for the extraordinary care required by Plaintiff-minor;
q.  severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or
r.  all other damages permitted by law.

152.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.

## COUNT VII
### Negligent Selection, Retention, Training, & Supervision – Defendant USA

153.    The Plaintiffs re-allege and incorporate by reference the above paragraphs of this Complaint as if fully re-stated herein.

154.    That Defendant USA had a duty to Ms. Reeser and Baby L.A. to select, hire, credential, and/or retain only competent physicians, residents, nurses, nurse-midwives, and/or other healthcare professionals to ensure that care and treatment would be provided accordance with accepted standards of medical practice, and to ensure that its actual, ostensible, and/or apparent agents, servants, and/or employees dealt properly with any complications that might arise in accordance with accepted standards of medical practice.

155.    That Defendant USA had a duty to Ms. Reeser and Baby L.A. to provide appropriate training and supervision to its physicians, residents, nurses, nurse-midwives, and/or other healthcare professionals to ensure that care and treatment would be provided in accordance with accepted standards of medical practice, and to ensure that its actual, ostensible, and/or apparent agents, servants, and/or employees dealt properly with any complications that might arise in accordance with accepted standards of medical practice.

156.    That Defendant USA breached its duty to Ms. Reeser and Baby L.A. and failed to meet the standard of reasonable care in the selection, hiring, credentialing, and/or retention of its actual, ostensible, and/or apparent agents, servants, and/or employees, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers.

157.    That Defendant USA breached its duty to Ms. Reeser and Baby L.A. and failed to meet the standard of reasonable care in the training and supervision of its actual, ostensible, and/or apparent agents, servants, and/or employees, including but not limited to Charles Edward Rollison, D.O.; Ronald Nichols, M.D.; Alma Garlo, M.D.; Joanne Kingsley, M.D.; Dana Virgo, M.D.; Monica Hill, M.D.; Laura Horka, R.N.; Ashley Savicke, R.N.; Jennifer B. Rice, R.N.; Ashley S. Booth, R.N.; and/or other healthcare providers.

158.    Reasonably prudent healthcare facilities under the same or similar circumstances would not have committed the aforementioned negligent acts and/or omissions.

159.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Baby L.A. did sustain serious and permanent injuries including permanent brain damage which has resulted in debilitating mental and motoric impairments.

160.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, Ms. Reeser did sustain injuries including unnecessary surgical intervention.

161.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have suffered great pain, suffering, disfigurement, loss of a normal life, loss of consortium, loss of society, disability and will in the future continue to endure such damages.

162.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs have incurred, and will continue to incur, medical and other expenses for the extraordinary needs of Baby L.A. for which they claim compensation herein.

163.    As a direct and proximate result of one or more of the aforesaid acts and/or omissions, the Plaintiffs did sustain other pecuniary loss and other expenses and damages and will in the future incur other pecuniary loss and expense, including but not limited to loss of earnings.

164.    As a direct and proximate result of the aforesaid negligent acts and/or omissions, Plaintiffs have suffered grievous injuries and damages, including but not limited to:

    a.   pain and suffering;
    b.   disfigurement and deformity;
    c.   mental and emotional injuries;
    d.   extensive medical expenses, both past and future;
    e.   brain damage/encephalopathy;
    f.   seizures;
    g.   mental status changes;
    h.   developmental delay;
    i.   tremendous pain and suffering;
    j.   disability;
    k.   mental anguish;
    l.   future pain and suffering;
    m.   future mental anguish;
    n.   loss of employability;
    o.   loss of earning capacity;
    p.   costs and expenses for the extraordinary care required by Plaintiff-minor;

    q.   severe loss of mobility, dexterity, alertness and inability to engage in those activities which an individual of Plaintiff-minor's age is accustomed to engage in and will in the future continue to suffer such losses; and/or

    r.   all other damages permitted by law.

165.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions, the Plaintiffs have lost the love, affection, companionship, and society that they would otherwise have had with their family, as well as the loss of family and social life, for which the Plaintiffs now claim damages.


WHEREFORE, the Plaintiffs, L.A., a legally incapacitated Minor, by and through his Mother and Next Friend, KIERSTEN REESER, and KIERSTEN REESER, Individually, and JEREMY ARMSTRONG, Individually, demand a Jury Trial for those counts of the Complaint that a jury trial is permitted and demand judgment against the Defendants in an amount to be proven at trial, pre and post judgment interest, costs, and attorney's fees and such other relief as the Court deems proper.

**PLAINTIFFS DEMAND TRIAL BY JURY**

<u>Dated</u>:  September 2, 2021                Respectfully Submitted,

                                      BEAM LEGAL TEAM LLC

                                    By:                         

                                    JACK BEAM, ESQ. P24600
                                    MATTHEW M. PATTERSON, ESQ.  P79553
                                    RYAN P. TIMONEY, ESQ.  P81685
                                    954 W. Washington Blvd., Suite 215
                                    Chicago, IL 60607
                                    (312) 733-0930; (312) 733-0921 Fax
                                    jbeam@beamlegalteam.com
                                    mpatterson@beamlegalteam.com
                                    rtimoney@beamlegalteam.com

42

and

GEOFFREY N. FIEGER, ESQ. P30441
FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555; (248) 355-5148 Fax
g.fieger@fiegerlaw.com

*Attorneys for Plaintiffs*